**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3455-16T1

HIGHLAND PARK BOARD OF
EDUCATION and PISCATAWAY
TOWNSHIP BOARD OF EDUCATION,

      Petitioners-Appellants,

v.

KIMBERLY HARRINGTON,
ACTING COMMISSIONER OF
EDUCATION, NEW JERSEY
STATE BOARD OF EDUCATION,
and HATIKVAH INTERNATIONAL
ACADEMY CHARTER SCHOOL,

      Respondents-Respondents.

_____

          Argued May 30, 2019 – Decided June 7, 2019

          Before Judges Haas, Sumners and Mitterhoff.

          On appeal from the New Jersey Department of Education.

          David B. Rubin argued the cause for appellants (David B. Rubin, PC, and The Busch Law Group, LLC, attorneys; David B. Rubin and Douglas M. Silvestro, on the brief).

Thomas O. Johnston argued the cause for respondent Hatikvah International Academy Charter School (Johnston Law Firm, LLC, attorneys; Thomas O. Johnston, of counsel and on the brief; Rula Alzadon Moor, on the brief).

Geoffrey N. Stark, Deputy Attorney General, argued the cause for respondents Kimberly Harrington, Acting Commissioner of Education and State Board of Education (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Donna Arons and Jennifer J. McGruther, Deputy Attorneys General, on the brief).

PER CURIAM

Appellants Highland Park Board of Education (Highland Park) and Piscataway Township Board of Education (Piscataway) (collectively appellants) appeal from the February 28, 2017 final decision of the Commissioner of Education (Commissioner), approving an application by Hatikvah International Academy Charter School (Hatikvah) to increase its enrollment from fifty to seventy-five students in kindergarten and first grade, and to implement a weighted enrollment lottery affording preference to economically disadvantaged students. We affirm.[1]

---

[1] This case was calendared back-to-back with three other appeals, and we heard oral argument on all four matters on the same day. In re Approval of Charter Amendment of Cent. Jersey Coll. Prep (Central Jersey), No. A-3074-16, North Brunswick Twp. Bd. of Educ. v. Harrington (North Brunswick), No. A-3415-

I.

We begin by reciting the essential background facts and procedural history of this matter. In March 2009, Hatikvah submitted a charter school application to the New Jersey Department of Education (Department or NJDOE), seeking to serve students in East Brunswick Township, Middlesex County—its "district of residence."[2] During its initial four-year charter period, it planned to serve students in kindergarten through fifth grade, with a projected maximum enrollment of 240 students. The goal was to eventually "expand grade levels through eighth grade, completing growth with a maximum of 396 students with 44 students per grade." It sought to build on the "multicultural strength" of the district through an International Baccalaureate (IB) program, which included a partial-immersion Hebrew language program. In compliance with the Charter School Program Act of 1995, N.J.S.A. 18A:36A-1 to -18 (Charter School Act or

_____

16, and Bd. of Educ. of Twp. of Piscataway v. N.J. Dep't of Educ. (Piscataway), No. A-5427-16. Because some of the issues in these appeals overlap, the reader is encouraged to review all four of our opinions in these cases, which are being released simultaneously.

[2] The term "district of residence" is defined as "the school district in which a charter school facility is physically located; if a charter school is approved with a region of residence comprised of contiguous school districts, that region is the charter school's district of residence." N.J.A.C. 6A:11-1.2.

A-3455-16T1

CSPA), East Brunswick students were given preference for enrollment. N.J.S.A. 18A:36A-8(a).

On May 14, 2009, the East Brunswick Board of Education (East Brunswick) adopted a resolution recommending that the Commissioner deny Hatikvah's application. See In re Approval of Hatikvah Int'l Academy Charter Sch., No. A-5977-09 (App. Div. Dec. 21, 2011) (slip op. at 5), certif. denied, 210 N.J. 28 (2012). East Brunswick alleged that Hatikvah's application

> interfered with the separation of church and state, had a negative economic impact on the district's taxpayers, and did not comport with the requirements for charter schools as codified in N.J.A.C. 6A:11 because it did not include an educator from East Brunswick. [It] . . . further asserted Hatikvah's single-cultural, single-emersion Hebrew language charter school would be at odds with and would not serve the multi-cultural community; it would unfairly compete with the Solomon Schechter Day School in East Brunswick; its proposed full day kindergarten would result in a lack of educational equity and access for East Brunswick residents; the petition did not accurately demonstrate East Brunswick's community interest in the charter school; and its needs analysis was flawed, inaccurate and did not document a need for the charter school.

> [Ibid.]

On July 6, 2010, the Commissioner granted final approval of Hatikvah's charter, effective from July 1, 2010 to June 30, 2014, to operate a school for grades kindergarten through fifth, with a maximum of fifty students per grade

for a total of 300 students, for an initial four-year period. East Brunswick appealed, arguing that Hatikvah failed to present evidence of sufficient enrollment under N.J.A.C. 6A:11-2.1(i)(14), because as a "district of residence" charter school it could not include non-district students in the count. Id. at 13. This court affirmed the Commissioner's decision, finding that "[t]he record reflect[ed] that Hatikvah cooperated with the Department in diligently providing requested information and documentation pertaining to a variety of matters, including student enrollment, by emails, faxes, and site visits." Id. at 19. The Supreme Court denied certification. Hatikvah, 210 N.J. at 28.

In 2013, Hatikvah submitted an application to the Department for a charter renewal and for an expansion to add grades sixth through eighth. The Commissioner granted the renewal, effective through June 2019, but denied the expansion "due to a decline in the school's academic performance in the 2012-13 school year."

In November 2014, Hatikvah filed another application for an amendment, seeking again to add grades sixth through eighth and to increase enrollment in its existing grades. See Highland Park Bd. of Educ. v. Hespe (Highland Park I), No. A-3890-14 (App. Div. Jan. 24, 2018) (slip op. at 3), certif. denied, 233 N.J.

485 (2018). East Brunswick, Highland Park, and the South River Board of Education (South River) opposed the application. Id. at 4.

On March 19, 2015, the Commissioner issued a final decision granting Hatikvah's request to expand into the middle school grades, at the same fifty-student maximum enrollment, but denied the request to expand the enrollment in kindergarten through fifth grade. Id. at 7. The Commissioner found that Hatikvah's academic performance had improved from the 2012-2013 school year, placing its students "in the ninety-sixth percentile in language arts literacy and eighty-seventh percentile in mathematics, in comparison to other schools across the State." Id. at 8.

Highland Park appealed, arguing that it was not required to fund its students' attendance at Hatikvah, a charter school located outside its school district. Id. at 8-19. We granted East Brunswick's motion to intervene, and granted Manalapan-Englishtown Board of Education's (Manalapan) and the New Jersey Charter School Association's (NJCSA) motions to participate as amici curiae. Ibid.

This court affirmed, finding that the record was sufficient to support the Commissioner's decision, and we rejected Highland's contention "that only the charter school's 'district of residence' is obligated to pay for its students to attend

6

the school." Id. at 19-21. The court also rejected, because it had not been raised below, East Brunswick and Manalapan's argument that Hatikvah was operating in violation of its charter by enrolling out-of-district students, stating that:

> If East Brunswick and Manalapan-Englishtown wish to pursue this issue, the districts may submit a complaint to the Hatikvah board of trustees asserting that the school is not being operated in accordance with its charter and, if the complaint is not "adequately addressed," the districts may present the complaint to the Commissioner pursuant to N.J.S.A. 18A:36A-15. We express no opinion on the merits of such a complaint, if filed.
>
> [Id. at 14.]

The Supreme Court denied certification. Highland Park I, 233 N.J. at 485.

In November 2015, Hatikvah filed a third application to amend its charter, seeking to expand its enrollment from fifty to seventy-five students per grade by the 2024 school year. On February 29, 2016, the Commissioner issued a final decision denying that request.

II.

We now turn to the application that is at the center of the current appeal. On November 10, 2016, Hatikvah filed a fourth application with the Commissioner to expand its charter, again seeking to increase enrollment from fifty to seventy-five students per grade, and, conditioned upon that approval, to

7

implement a weighted enrollment lottery for economically disadvantaged students. In support of that application, Hatikvah submitted board resolutions and rationale statements.

In its "Resolution One," Hatikvah sought an amendment to its charter to progressively increase the maximum approved number of students per grade from fifty to seventy-five, starting with kindergarten for the 2017-2018 school year and ending with eighth grade for the 2025-2026 school year. In the alternative, in "Resolution Two," Hatikvah sought to amend its charter to increase enrollment from fifty to seventy-five students, starting with kindergarten, first, and second grade for the 2017-2018 school year, and ending with eighth grade for the 2023-2024 school year.

With respect to the request for expanded enrollment, Hatikvah represented that there was "excess demand in the community by parents/guardians to enroll their children at the School." It claimed that the number of applicants outnumbered the available seats in every grade, and that as of June 30, 2016, there were 214 students on the waitlist for kindergarten through second grade, as follows:

| District | Grade K | Grade 1 | Grade 2 |
|---|---|---|---|
| East Brunswick | 11 | 6 | 8 |
| Non-East Brunswick | 76 | 56 | 57 |
| Total (waitlisted students) | **87** | **62** | **65** |

8

Additionally, for the 2016-2017 school year, twenty-four of the available fifty kindergarten seats went to siblings of students thereby "greatly limiting access to the school for new families."

Hatikvah maintained that expanded enrollment would allow it to "implement an even more robust instructional staffing model" and "enhance the extracurricular programs that it can offer to middle school students." It represented that "the unique educational approaches of the School have resulted in strong academic performance and year-to-year growth on the NJ PARCC State tests." For example, in 2016, its third through sixth grade students significantly outperformed their peers:

| Subject | Hatikvah | Weighted Average of All Sending Districts | NJ State | NJ Charters |
|---------|----------|-------------------------------------------|----------|-------------|
| ELA | 67.8% | 64.8% | 51.6% | 47.9% |
| Math | 67.2% | 62.7% | 47.2% | 41.0% |

With regard to the weighted lottery system, Hatikvah sought to amend its charter to "allow economically disadvantaged students to have an increased priority for admission using a 2:1 margin." At the time of the application, Hatikvah operated a random blind lottery under the supervision of an independent official, where each child was assigned a number and each grade level was "divided into three groups drawn in order of the preferences afforded

A-3455-16T1

to the groups as delineated in its charter: Siblings, East Brunswick residents and non-East Brunswick residents." It "targeted recruitment efforts in areas within five miles of its location in East Brunswick, including most importantly, Section 8 housing in East Brunswick," utilizing direct mailers, flyers, and television advertisements in English and Spanish. Under that system, Hatikvah asserted it had been "extremely successful in creating a diverse school community." Indeed, many of its students were first-generation Americans whose parents came from about thirty different countries and spoke a variety of languages.

Hatikvah represented that increasing the economic diversity of its student body through the weighted lottery system would "further social cohesion across a broader spectrum of students." It posited that charter schools "are uniquely positioned to create economically diverse student bodies where economically disadvantaged students can thrive," because

> [u]nlike traditional public schools whose seats are limited to students who live within their local geographical boundaries, charter schools can draw students from its resident and neighboring districts. Thus charter schools' student bodies do not reflect residential segregation patterns driven by local geography, be they economic, racial or ethnic. Charter schools have means to intentionally create economically diverse student bodies. . . .

10

As for the fiscal impact of its application, Hatikvah stated that increasing enrollment would have a "very limited financial impact on taxpayers in East Brunswick" because the majority of the waitlisted students come from districts other than East Brunswick, and thus those districts would be required to pay for the added students. Increased enrollment would thus have a "negligible and immaterial fiscal impact" on both "Hatikvah's resident district East Brunswick as well as non-resident sending districts." Hatikvah calculated that under its Resolution One, the impact on the sending districts' budgets ranged from .077% to .011%, based on enrollment of the waitlisted students:

| Sending District | 2015-2016 Total District Revenue ($) | 2016-2017 Waitlisted Applicants Who Would be Able to Enroll to Fill New Capacity | Projected Costs to Sending Districts | Fiscal Impact (Projected Costs as a Percent of Total District Revenue) |
|---|---|---|---|---|
| East Brunswick | 149,628,859 | 9 | 114,833 | .077% |
| South River | 32,316,812 | 2 | 15,203 | .047% |
| Highland Park | 32,655,815 | 1 | 14,571 | .045% |
| North Brunswick | 89,484,289 | 3 | 25,020 | .028% |
| Old Bridge | 141,098,853 | 3 | 31,607 | .022% |
| Sayreville | 85,365,388 | 2 | 15,145 | .018% |
| Edison | 235,500,869 | 3 | 35,553 | .015% |
| South Plainfield | 57,169,108 | 1 | 10,000 | .017% |
| East Windsor | 85,800,550 | 1 | 9752 | .011% |
| Total Waitlisted | | **25** | | |

Under its Resolution Two, Hatikvah calculated that the impact on sending districts' budgets ranged from .196% to .004%, as follows:

11

| Sending District | 2015-2016 Total District Revenue ($) | 2016-2017 Waitlisted Applicants Who Would be Able to Enroll to Fill New Capacity | Projected Costs to Sending Districts | Fiscal Impact (Projected Costs as a Percent of Total District Revenue) |
|---|---|---|---|---|
| East Brunswick | 149,628,859 | 23 | 293,457 | .196% |
| North Brunswick | 89,484,289 | 13 | 108,420 | .121% |
| South River | 32,316,812 | 5 | 38,005 | .118% |
| Highland Park | 32,655,815 | 2 | 29,142 | .089% |
| Milltown | 16,216,247 | 1 | 10,694 | .066% |
| Sayreville | 85,365,388 | 7 | 53,011 | ..062% |
| Edison | 235,500,869 | 9 | 106,659 | .045% |
| East Windsor | 85,800,550 | 3 | 29,256 | .034% |
| Old Bridge | 141,098,853 | 4 | 42,144 | .030% |
| Marlboro | 86,394,503 | 2 | 22,363 | .026% |
| South Plainfield | 57,169,108 | 1 | 10,000 | .017% |
| Manalapan | 82,300,339 | 1 | 12,542 | .015% |
| Franklin Park | 156,416,249 | 1 | 13,266 | .008% |
| Piscataway | 111,295,663 | 1 | 8400 | .006% |
| New Brunswick | 180,444,475 | 1 | 10,973 | .006% |
| Perth Amboy | 233,538,204 | 1 | 9648 | .004% |
| Total Waitlisted | | **75** | | |

Further, Hatikvah estimated that under both its Resolution One and Two, the cost for appellants to send their students to Hatikvah would be less than the projected costs if the students remained in appellants' districts:

**Resolution One**

| District | Projected Costs to Sending Districts of Students Who Transfer to Hatikvah | Projected Costs to Sending Districts of Students Who Remain in District |
|---|---|---|
| Highland Park | $14,571 | $15,789 |

12

**Resolution Two**

| District | Projected Costs to Sending Districts of Students Who Transfer to Hatikvah | Projected Costs to Sending Districts of Students Who Remain in District |
|---|---|---|
| Highland Park | $29,142 | $31,578 |
| Piscataway | $8400 | $13,289 |

In response to Hatikvah's application, appellants Highland Park and Piscataway submitted almost identical resolutions calling for a moratorium on new charter school seats in Middlesex and Somerset Counties.[3] They raised general objections asserting that payments to the charter schools drained funds from, and diminished money available to serve students in, the traditional public schools. Appellants represented that for the 2016-2017 school year, 2316 students attended the five existing charter schools in Middlesex and Somerset Counties (including Hatikvah), and that if the applications for expansions were approved for these schools, and a sixth charter school was added, the number of charter school seats would increase by 128% to 5283.

Appellants alleged there was already a lack of demand for the existing charter schools located in Middlesex and Somerset counties, and that the expansion of these schools would exacerbate that issue. They also argued that

---

[3] Similar resolutions were submitted by North Plainfield Board of Education, Educational Services Commission of New Jersey, Monroe Township Board of Education, South River Board of Education, South Brunswick Board of Education, Middlesex Borough Board of Education, New Brunswick Board of Education, and South Amboy Board of Education.

many charter schools, "in direct contradiction to the letter and spirit of the" CSPA, were seeking to "expand in order to enroll additional students from districts outside of the charter schools' approved districts or regions of residence due to a lack of interest from students who live in the very communities for which the charters were created to serve."

Appellants took no position on Hatikvah's weighted lottery system, and instead represented that only 48% of the students enrolled in Hatikvah resided in the school's district of residence. However, they also alleged, without providing any statistics, that Hatikvah and another charter school, Thomas Edison EnergySmart Charter School (TEECS), enrolled "a significantly more segregated student body than any of the resident or non-resident sending districts with respect to race, socioeconomic status, and need for special education."

East Brunswick, Hatikvah's district of residence, also opposed Hatikvah's application. It argued that the Commissioner should not approve Hatikvah's fourth request to increase its enrollment because "[t]he conditions that existed at the time of each of the Commissioner's denials have only negatively escalated." It alleged that enrollment of East Brunswick students in Hatikvah,

which had not been approved as a regional charter school,[4] had dropped from 50% in 2015-16 to 45% in 2016-17, and thus there was no community need for increased enrollment.  It represented that enrollment totaled:

| Grade | Approved Enrollment 2016-2017 | East Brunswick Actual Enrollment 2016-2017 |
|---|---|---|
| K | 50 | 23 |
| 1 | 50 | 23 |
| 2 | 50 | 23 |
| 3 | 50 | 33 |
| 4 | 50 | 24 |
| 5 | 50 | 21 |
| 6 | 50 | 18 |
| 7 | 50 | 16 |
| Total | 400 | 181 |

Therefore, East Brunswick maintained that:

> The supposed need for increasing enrollment from 50 to 75 students per grade is based on a "reported" wait list of non-resident students from 24 communities scattered across multiple counties.  Wait lists reported by the Charter School for non-East Brunswick residents should not be considered in reviewing the Charter School's application.  Clearly there is more than enough room for any East Brunswick residents if they choose to attend the Charter School.

East Brunswick also alleged that the "financial impact of the expansion combined with ongoing costs to support the Charter School would increase to

[4]  A regional charter school serves a region or collection of districts, as opposed to a single district.  In re Charter Sch. Appeal of Greater Brunswick Charter Sch., 332 N.J. Super. 409, 423-24 (App. Div. 1999).

107% of the amount of the State's imposed budget cap" and that the "estimate of the cost of their proposed expansion to East Brunswick Public Schools in 2016-2017 is an additional $114,833-$293,457. The additional cost of the grade expansion would escalate to over $1 million per year over the next five years." Further, in order to meet the required financial support of the Charter School, East Brunswick asserted that in 2011, it cut opportunities for traditional public school students, including the elimination of the World Language Program and summer academy, and the reduction in teaching staff.[5]

On February 28, 2017, the Commissioner, based on the Department's recommendation and her review of the record, issued a one-page final decision approving Hatikvah's application to amend its charter to increase enrollment and to implement a weighted lottery. The Commissioner stated that the Department had "completed a comprehensive review, including, but not limited to, student performance on statewide assessments, operational stability, fiscal viability, public comment, fiscal impact on sending districts, and other information in order to make a decision regarding the school's amendment request."

---

[5] Three New Jersey legislators also wrote to the Commissioner opposing Hatikvah's application. The Commissioner also considered a petition submitted on behalf of more than 1400 individuals urging denial of the application, and approximately 300 other public comments.

The Commissioner approved the expansion for kindergarten and first grade only, and confirmed the school's maximum approved enrollment through June 2019, the end of the charter renewal period, as follows:

| Grade | 2016-2017 | 2017-2018 | 2018-2019 |
|-------|-----------|-----------|-----------|
| K | 50 | 75 | 75 |
| 1 | 50 | 50 | 75 |
| 2 | 50 | 50 | 50 |
| 3 | 50 | 50 | 50 |
| 4 | 50 | 50 | 50 |
| 5 | 50 | 50 | 50 |
| 6 | 50 | 50 | 50 |
| 7 | 50 | 50 | 50 |
| 8 | | 50 | 50 |
| Total | 400 | 475 | 500 |

This appeal followed.

On appeal, appellants raise the following contentions:

POINT I

The Commissioner Failed To Analyze Hatikvah's Application Or To Disclose The Basis For Her Approval.

POINT II

The Commissioner Failed To Consider The Segregative Impact Of Hatikvah's Charter Amendment.

POINT III

Other Significant Deficiencies [I]n Hatikvah's Application Render The Commissioner's Approval Arbitrary, Capricious and Unreasonable.

17

POINT IV

There Is No Authority To Compel Highland Park [A]nd Piscataway To Fund Students' Attendance [A]t Hatikvah.

III.

In Point I of their brief, appellants argue that the Commissioner's decision approving the amendment was arbitrary, capricious or unreasonable because she failed to analyze Hatikvah's application or to provide any discernable reason for the approval. We disagree.

By way of background, charter schools are public schools that operate under a charter granted by the Commissioner, operate independently of a local board of education, and are managed by a board of trustees. N.J.S.A. 18A:36A-3(a). In the CSPA, the Legislature found and declared that

> the establishment of charter schools as part of this State's program of public education can assist in promoting comprehensive educational reform by providing a mechanism for the implementation of a variety of educational approaches which may not be available in the traditional public school classroom. Specifically, charter schools offer the potential to improve pupil learning; increase for students and parents the educational choices available when selecting the learning environment which they feel may be the most appropriate; encourage the use of different and innovative learning methods; establish a new form of accountability for schools; require the measurement of learning outcomes; make the school the unit for

18

educational improvement; and establish new professional opportunities for teachers.

The Legislature further finds that the establishment of a charter school program is in the best interests of the students of this State and it is therefore the public policy of the State to encourage and facilitate the development of charter schools.

[N.J.S.A. 18A:36A-2.]

Charter schools are "open to all students on a space available basis. . . ." N.J.S.A. 18A:36A-7. A charter school may not discriminate in its admissions policies and practices, but "may limit admission to a particular grade level or to areas of concentration of the school, such as mathematics, science, or the arts." N.J.S.A. 18A:36A-7. Enrollment in a charter school is voluntary, and a student may withdraw from a charter school at any time. N.J.S.A. 18A:36A-9.

Preference for enrollment must be given to students who reside in the school district in which the charter school is located, and the school cannot charge those resident students tuition. N.J.S.A. 18A:36A-8(a). "If there are more applications to enroll in the charter school than there are spaces available, the charter school shall select students to attend using a random selection process." N.J.S.A. 18A:36A-8(a). "If available space permits, a charter school may enroll non-resident students. The terms and condition of the enrollment shall be outlined in the school's charter and approved by the commissioner."

N.J.S.A. 18A:36A-8(d).  A charter school shall maintain a waiting list of grade-eligible students, divided into two groups, students from the district or region of residence and students from non-resident districts.  N.J.A.C. 6A:11-4.6(a)(2).

Funding for charter schools comes from the local school district, but is not equivalent to the per pupil funding that a traditional public school receives.  N.J.S.A. 18A:36A-12(b).  The CSPA funding provision provides in part that "the school district of residence shall pay directly to the charter school for each student enrolled in the charter school who resides in the district an amount equal to 90%" of certain per pupil state aid and any federal funds "attributable to the student."  N.J.S.A. 18A:36A-12(b).

Applications to establish a charter school are governed by N.J.S.A. 18A:36A-4 to -5, and the implementing regulation, N.J.A.C. 6A:11-2.1.  The Commissioner has final authority to grant or reject a charter.  N.J.S.A. 18A:36A-4(c).  "The notification to eligible applicants not approved as charter schools shall include reasons for the denials."  N.J.A.C. 6A:11-2.1(f) (emphasis added).  An initial charter is for a term of four years and may be renewed for a five-year period.  N.J.S.A. 18A:36A-17.

After approval, the Commissioner annually assesses whether the charter school is meeting the goals of its charter.  N.J.S.A. 18A:36A-16.  The

Commissioner also annually assesses "the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence." N.J.A.C. 6A:11-2.2(c). To facilitate that review, charter schools must submit an annual report to the Commissioner, local board of education, and the county superintendent of schools. N.J.S.A. 18A:36A-16(b); N.J.A.C. 6A:11-2.2(a). The Commissioner may revoke a charter at any time if the school has not fulfilled or has violated any of the conditions of its charter. N.J.S.A. 18A:36A-17.

Applications to renew a charter are governed by N.J.S.A. 18A:36A-17, and the implementing regulation, N.J.A.C. 6A:11-2.3. The Commissioner shall grant or deny the renewal of a charter based upon a comprehensive review of the school, including, among other things, the annual reports, recommendation of the district board of education or school superintendent, and student performance on statewide tests. N.J.A.C. 6A:11-2.3(b). "The notification to a charter school that <u>is not granted</u> a renewal shall include reasons for the denial." N.J.A.C. 6A:11-2.3(d) (emphasis added).

As in this case, a charter school may also apply to the Commissioner for an amendment to its charter, including for an expansion of enrollment and the establishment of a weighted lottery. N.J.A.C. 6A:11-2.6(a)(1)(i), (v). In support

of that application, the board of trustees of a charter school shall submit the request in the form of a board resolution.  N.J.A.C. 6A:11-2.6.  Similar to the initial approval process, boards of education in the district of residence can submit comments in response to the application.  N.J.A.C. 6A:11-2.6(c).  The Department "shall determine whether the amendments are eligible for approval and shall evaluate the amendments based on" the Charter School Act and implementing regulations, and the "Commissioner shall review a charter school's performance data in assessing the need for a possible charter amendment." N.J.A.C. 6A:11-2.6(b).  "The Commissioner may approve or deny amendment requests of charter schools and shall notify charter schools of decisions."  N.J.A.C. 6A:11-2.6(d).

With this essential regulatory background in mind, and before moving to a consideration of appellants' contentions concerning the sufficiency of the Commissioner's decision, we will briefly address Hatikvah's argument that appellants lack standing to challenge the Commissioner's decision because the CSPA does not specifically permit an appeal from a decision approving an amendment to a charter.

As we recently stated in In re Renewal Application of TEAM Acad. Charter Sch., ___ N.J. Super. ___, ___ (App. Div. 2019) (slip op. at 8-9):

"Standing 'refers to the plaintiff's ability or entitlement to maintain an action before the court.'" In re Adoption of Baby T, 160 N.J. 332, 340 (1999) (quoting N.J. Citizen Action v. Riveria Motel Corp., 296 N.J. Super. 402, 409 (App. Div. 1997)). Standing is a threshold issue that "neither depends on nor determines the merits of a plaintiff's claim." Watkins v. Resorts Int'l Hotel & Casino, 124 N.J. 398, 417 (1991). "Unlike the Federal Constitution, there is no express language in New Jersey's Constitution which confines the exercise of our judicial power to actual cases and controversies. U.S. Const. art. III, § 2; N.J. Const. art. VI, § 1." Crescent Park Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 107 (1971).

Our [c]ourts do not, however, render advisory opinions, function in the abstract, or consider actions brought by plaintiffs who are "merely interlopers or strangers to the dispute." Ibid. (citation omitted). "To possess standing in a case, a party must present a sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and a substantial likelihood that the party will suffer harm in the event of an unfavorable decision." In re Camden Cty., 170 N.J. 439, 449 (2002) (citation omitted).

Hatikvah correctly points out that there are no provisions in the CSPA or the implementing regulations providing for an appeal from the Commissioner's decision approving an amendment to a charter, nor is there any provision permitting an appeal of any decision by a non-district of residence. In this regard, N.J.S.A. 18A:36A-4(d), which governs the establishment of charter schools, provides only that "[t]he local board of education or a charter school

23

applicant may appeal the decision of the commissioner to the Appellate Division of the Superior Court." Similarly, N.J.A.C. 6A:11-2.5, which controls the "charter appeal process," provides that "[a]n eligible applicant for a charter school, a charter school, or a district board of education or State district superintendent of the district of residence of a charter school may file an appeal according to N.J.S.A. 18A:6-9.1."

However, in "New Jersey, courts take 'a liberal approach to standing to seek review of administrative actions.'" In re Grant of Charter to Merit Preparatory Charter Sch. of Newark, 435 N.J. Super. 273, 279 (App. Div. 2014) (quoting In re Camden Cty., 170 N.J. at 448). In Merit Preparatory, the New Jersey Education Association (NJEA) appealed from the Commissioner's decision granting charters to two "blended" charter schools, where students were instructed both in person and online. Id. at 276-77. In addressing standing, we concluded that although it was not clear that NJEA's members would be "adversely affected" by approval of the charter schools, the NJEA had nevertheless "demonstrated a slight private interest that, together with the substantial public interest, affords it standing to pursue this appeal." Id. at 280.[6]

---

[6] We have also entertained challenges by boards of education to renewals and amendments of charters in other cases, including In re Red Bank Charter Sch.,

We are satisfied that a similar conclusion is appropriate here. The record indicates that appellants will be directly affected by the Commissioner's decision that they are required to fund their students' attendance at Hatikvah, and they have a private interest in addressing the application to expand enrollment, which will potentially open more seats for students from their districts. Moreover, the issues raised in this appeal, notably the effect of an increase in enrollment on the sending districts and the interpretation of the funding provision, are of "great public interest" and thus, even if appellants had demonstrated only a "slight additional private interest," they should be afforded standing. Merit Preparatory, 435 N.J. Super. at 279 (quoting Salorio v. Glaser, 82 N.J. 482, 491 (1980)). Therefore, we reject Hatikvah's contention on this point.

Turning to the merits of appellants' arguments under Point I, we note that the scope of judicial review of a final decision of the Commissioner on a charter school application is limited. In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013). We may reverse only if the Commissioner's decision is "arbitrary, capricious, or unreasonable." Ibid. In making that determination, our review is generally restricted to three inquiries:

367 N.J. Super. 462, 467 (App. Div. 2004) (Red Bank Board of Education opposed renewal and expansion of a charter school) and Highland Park I, No. A-3890-14 (appeal from amendment).

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Id. at 385-86 (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

"When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 28 (2007). The court "may not substitute its own judgment for the agency's even though the court might have reached a different result. . . ." In re Carter, 191 N.J. 474, 483 (2007) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).

"[T]he arbitrary, capricious, or unreasonable standard . . . subsumes the need to find sufficient support in the record to sustain the decision reached by the Commissioner." Quest Acad., 216 N.J. at 386. "[A] failure to consider all the evidence in a record would perforce lead to arbitrary decision making." Ibid. However, in cases where "the Commissioner is not acting in a quasi-judicial capacity," and is instead acting in [her] legislative capacity, as [s]he was doing here, [s]he "need not provide the kind of formalized findings and conclusions

necessary in the traditional contested case." TEAM Acad., ___ N.J. Super. ___ (slip op. at 30) (quoting In re Grant of Charter Sch. Application of Englewood on the Palisades Charter Sch., 320 N.J. Super. 174, 217 (App. Div. 1999), aff'd as modified, 164 N.J. 316 (2000)).

Thus, although the arbitrary, capricious, or unreasonable standard demands "that the reasons for the decision be discernible, the reasons need not be as detailed or formalized as an agency adjudication of disputed facts; they need only be inferable from the record considered by the agency." Englewood, 320 N.J. Super. at 217. See Red Bank, 367 N.J. Super. at 476 ("[T]he reasons for the decision need not be detailed or formalized, but must be discernible from the record."); Bd. of Educ. of E. Windsor Reg'l Sch. Dist. v. State Bd. of Educ., 172 N.J. Super. 547, 552 (App. Div. 1980) (detailed findings of fact not required by Commissioner in reducing amount local school board sought to increase its budget).

Furthermore, there is no statutory or regulatory provision requiring the Commissioner to include reasons for granting an application to amend. The regulations provide only that the notification shall include reasons for the denial of an initial charter school application, N.J.A.C. 6A:11-2.1(f), and an application for renewal, N.J.A.C. 6A:11-2.3(d). The Commissioner is not

required to include reasons for granting an initial charter or a renewal, nor is he or she required to include reasons for granting or denying an application to amend.

To that end, Quest Academy, 216 N.J. at 390, as cited by appellants, is distinguishable. In that case, the operator of a proposed charter school appealed from the Commissioner's decision denying the charter. Id. at 373. The Commissioner's initial decision was "short on detail with respect to the application's deficiencies." Ibid. However, after the appeal was filed, the Commissioner submitted a written amplification of his reasons for denying the application. Id. at 374. The Court affirmed, finding in relevant part that:

> Although the letter of denial did not detail the deficiencies found in the application, it offered instead a face-to-face meeting to review in detail the shortcomings in the application that Quest Academy submitted. According to the Commissioner, the large number of applicants (forty-five) who were reviewed in the batch with Quest Academy rendered lengthy written responses difficult and taxing of precious departmental resources. While it would be naturally preferable from the applicant's perspective to receive initially more than a generic form letter denying an application, here Quest Academy received a bit more than that. Some information about the application's shortcomings was provided in the denial letter, and the subsequent amplification fully detailed those issues. In reviewing as complex a proposal as that required for a newly proposed charter school, there is a benefit to offering a discussion, instead of a written cataloguing, of mistakes

> or deficiencies in the application that has been rejected. We do not fault the Commissioner for choosing a dialogue involving constructive criticism as her preferred approach for producing approvable applications when resubmitted.
>
> [Id. at 390.]

Quest Academy is distinguishable from the present case because there is no requirement that the Commissioner detail her findings in approving an amendment. Although it would have been helpful for the Commissioner to make some findings in support of her decision, particularly since she had denied an identical request one year earlier, she was not required to do so. TEAM Acad., ___ N.J. Super. ___ (slip op. at 40). Instead, the focus on review is whether the reasons for the Commissioner's decision are discernible from the record. Red Bank, 367 N.J. Super. at 476. As explained below, they clearly are.

Here, the Commissioner's decision approving Hatikvah's request to amend its charter to increase enrollment in kindergarten and first grade by fifty students is supported by the record and achieves the legislative policy of promoting charter schools. Most notably, it is undisputed that Hatikvah's performance data, a significant factor in assessing a request to amend a charter, N.J.A.C. 6A:11-2.6(b), was, as represented by its students' PARCC scores, significantly higher than the State average. Further, the approval was in conformance with the

legislative policy of encouraging innovative approaches by charter schools, in that, Hatikvah had implemented a partial English/Hebrew language immersion program, which is not widely available in the traditional public schools in the State. N.J.S.A. 18A:36A-2.

The record also demonstrates that there was a need for the increase in enrollment for kindergarten and first grade because there was a waiting list of eighty-seven students for kindergarten and sixty-two students for first grade. Expansion of enrollment will allow Hatikvah to meet that need, strengthen its academic program, and enhance its extracurricular program.

Further, the record shows that Hatikvah, which had been submitting detailed annual reports to the Commissioner since it was approved to operate in 2010, and had submitted a financial audit prior to having its charter renewed in 2014, was organizationally sound and fiscally viable. N.J.S.A. 18A:36A-16(b); N.J.A.C. 6A:11-2.2. Hatikvah represented that it had a stable and qualified board of directors, and a "finding-free audit for the three years prior to the amendment request." Moreover, Hatikvah presented evidence that the expansion would have little fiscal impact on East Brunswick, its district of residence, and the other sending districts. Lastly, appellants do not dispute that the weighted lottery will foster expanded enrollment of economically

disadvantaged students.

Because the Commissioner's decision was amply supported by the record and achieves the legislative goals of the CSPA, we reject appellants' contentions on this point.

IV.

In Point II, appellants argue that the Commissioner's decision was arbitrary, capricious, or unreasonable because she failed to consider the alleged segregative impact of Hatikvah's charter amendment on the district. However, appellants failed to provide sufficient evidence of a segregative effect to warrant either more detailed scrutiny or the denial of the application and, therefore, we conclude that this argument also lacks merit.

In its resolution in support of its application for an amendment to its charter, Hatikvah asserted that it had "been extremely successful in creating a diverse school community," and that it sought to "increase the diversity of its student body by including more students at risk of academic failure and greater demographic diversity."

In opposition to the amendment, appellants asserted without any statistical evidence, that Hatikvah and TEECS enrolled "a significantly more segregated student body than any of the resident or non-resident sending districts with

respect to race, socioeconomic status, and need for special education."  They

also asserted that it was "unclear whether the NJDOE gives due consideration to

the increased segregation of students caused by expanding charter schools."

On appeal, appellants submitted additional enrollment data, which they

contend demonstrated that Hatikvah had become "an enclave for white students

that does not even remotely reflect the demographics of the local community it

purports to serve."  They compared Hatikvah's enrollment with the local public

school's enrollment for the 2016-2017 school year, as follows:[7]

| Ethnic/Racial Group | Hatikvah Students | East Brunswick Students | Highland Park Students | Piscataway Students |
|---|---|---|---|---|
| White | 69.7% | 53.7% | 37.5% | 15.7% |
| Asian | 13.0% | 33.5% | 24.0% | 33.6% |
| Hispanic | 8.2% | 6.5% | 22.4% | 19.0% |
| Black | 6.4% | 4.7% | 10.8% | 28.8% |

Appellants also asserted that for the 2016-2017 school year, only 5.1% of

Hatikvah students qualified for free or reduced lunches, in contrast to 15.7% in

East Brunswick, 36.9% in Highland Park, and 32% in Piscataway.  They argue

that these statistics are prima facie proof that Hatikvah does not reflect a "cross

section of the community's school age population including racial and academic

factors."  N.J.S.A. 18A:36A-8(e).

In response, Hatikvah cited to the 2010 census data, which indicated that

---

[7] Available at https://rc.doe.state.nj.us/PerformanceReports.aspx

A-3455-16T1

the racial/ethnic breakdown of the school age population in East Brunswick (including both public and private school students) was: 60% white; 5% black or African American; 27% Asian; and 8% Hispanic. Hatikvah maintained that that data was similar to its students' racial/ethnic breakdown, which was as follows:

| Hatikvah's School Year | White | Black | Asian | Hispanic |
|---|---|---|---|---|
| 2014-2015 | 69.5% | 5.4% | 16.1% | 7.4% |
| 2015-2016 | 70.1% | 6.6% | 13% | 8.5% |

Further, Hatikvah represented that for the 2016-2017 school year, 5% of its students qualified for free or reduced lunch, 13% had disabilities, and 3% were English language learners (ELL).

It is well established that, "[r]ooted in our Constitution, New Jersey's public policy prohibits segregation in our public schools. . . ." Englewood, 164 N.J. at 324. Segregation is also "specifically prohibited in charter schools." TEAM Acad., ___ N.J. Super. ___ (slip op. at 37) (citing N.J.S.A. 18A:36A-7). Thus, the CSPA provides that "[t]he admission policy of the charter school shall, to the maximum extent practicable, seek the enrollment of a cross section of the community's school age population including racial and academic factors." N.J.S.A. 18A:36A-8(e). Further, N.J.S.A. 18A:36A-7 states that:

A charter school shall be open to all students on a space

available basis and shall not discriminate in its admission policies or practices on the basis of intellectual or athletic ability, measures of achievement or aptitude, status as a person with a disability, proficiency in the English language, or any other basis that would be illegal if used by a school district; however, a charter school may limit admission to a particular grade level or to areas of concentration of the school, such as mathematics, science, or the arts. A charter school may establish reasonable criteria to evaluate prospective students which shall be outlined in the school's charter.

Our Supreme Court has held that the "form and structure" of the segregative analysis is up to the Commissioner and the Department to determine. Englewood, 164 N.J. at 329. "The Commissioner must consider the impact that the movement of pupils to a charter school would have on the district of residence" and "be prepared to act if the de facto effect of a charter school were to affect a racial balance precariously maintained in a charter school's district of residence." Id. at 328. "The Commissioner must vigilantly seek to protect a district's racial/ethnic balance during the charter school's initial application, continued operation, and charter renewal application." Red Bank, 367 N.J. Super. at 472.

> [S]egregation, however caused, must be addressed. To be timely addressed, assessment cannot wait until after a charter school has been approved for operation and is already taking pupils from the public schools of a district of residence. The Commissioner must assess

A-3455-16T1

whether approval of a charter school will have a segregative effect on the district of residence of the charter school.  Once a charter school is operating, the Commissioner must also assess whether there is a segregative effect in any other district sending pupils to the approved charter school.

[Englewood, 164 N.J. at 330.]

In response to the Court's decision in Englewood, and to the companion case, In re Greater Brunswick Charter School, 164 N.J. 314, 315 (2000), the Board adopted regulations requiring the Commissioner, prior to approval of a charter, N.J.A.C. 6A:11-2.1(j), and on an annual basis thereafter, N.J.A.C. 6A:11-2.2(c), to "assess the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence."  The assessment shall be based on the enrollment from the initial recruitment period pursuant to N.J.A.C. 6A:11-4.4(a) and (b).  32 N.J.R. 3560(a), 3561 (Oct. 2, 2000).  N.J.A.C. 6A:11-4.4(a) provides that "a charter school shall submit to the Commissioner the number of students by grade level, gender and race/ethnicity from each district selected for enrollment from its initial recruitment period for the following school year."

Appellants argue that the Commissioner's decision granting the expansion of enrollment is arbitrary and capricious because "there is nothing discernable" in either her decision or the record to suggest that she considered its assertions

35

that Hatikvah enrolled a significantly more segregated student body than any of the resident or non-resident school districts. However, as set forth above, the Commissioner was not required to include reasons for granting the application to amend the charter. See Red Bank, 367 N.J. Super. at 476 (Commissioner did not specifically address the segregation argument in his letter approving the charter school's renewal and expansion). Nor did appellants present to the Commissioner sufficient evidence of a segregative effect to warrant more in-depth scrutiny. Id. at 472-85.

Further, appellants' unsubstantiated generalized protests did not provide a basis to deny the application. Ibid. It is undisputed that Hatikvah did not discriminate in its admission policies or practices. Hatikvah operated a random race-blind lottery under the supervision of an independent official. It does not interview or otherwise pre-screen applicants based on intellectual ability, race, or ethnicity. It recruited from a cross-section of the school age population, in accordance with its charter agreement, targeting recruitment within a five-mile radius of the school, most notably in Section 8 housing complexes, using direct mailings, face-to-face solicitations, flyers, and television ads in English and Spanish. It also sought to increase its diverse student population through implementation of a weighted lottery system affording preference to

economically disadvantaged students.

Additionally, even if appellants had presented the information about student enrollment data to the Commissioner that they now present for the first time in their appellate brief, it would not have provided a basis to reject the application. The data provided by appellants on appeal shows a disparity between the enrollment of minority students in Hatikvah and students in the public schools in East Brunswick, Highland Park, and Piscataway. However, the census data provided by Hatikvah, which includes both public and private school-aged children in East Brunswick (its district of residence, where the majority of students reside), is much closer to the racial/ethnic breakdown of Hatikvah. In any event, appellants do not argue that the school districts are becoming more segregated, or that Hatikvah's existence has worsened the existing racial imbalance. See Bd. of Educ. of Hoboken v. N.J. State Dep't of Educ., No. A-3690-14 (App. Div. June 29, 2017) (slip op. at 15) (affirmed charter renewal where there were no allegations that the charter school's practices after the enrollment of students by an impartial lottery exacerbated the racial or ethnic balance); see also TEAM Acad., ___ N.J. Super. ___ (slip op. at 14) (stating that "[t]he mere fact that the demographics of the charter schools do not mirror the demographics of the [d]istrict does not alone establish a

A-3455-16T1

segregative effect").

In that regard, this case is distinguishable from Red Bank, 367 N.J. Super. at 462. In that case, the Board of Education (Board) appealed from the Commissioner's decision approving an application by a charter school to renew its charter. Id. at 467. The Board opposed the application on the basis that the school's operation had worsened the racial/ethnic imbalance, citing to data showing that since the charter school opened, the percentage of non-minority students in the traditional public schools had decreased from 32% to 18%, and a disproportionate number of non-minority students were enrolled in the charter school. Id. at 469. The Board also alleged that prior to standardized testing, the charter school frequently returned enrolled minority students with poor academic records to the traditional public schools. Id. at 479.

The Commissioner in Red Bank did not specifically address the segregation argument in the final decision. Id. at 476. However, this court discerned from the entire record, including the Commissioner's brief on appeal, that the Commissioner had concluded there was "no evidence in the record to suggest that the charter school has promoted racial segregation among the district's school-age children," and "there is no requirement that the two schools have exactly the same minority/non-minority enrollment figures." Ibid.

(internal quotation marks omitted). We held that "the Commissioner is to assess whether or not the charter school is seeking 'a cross section of the community's school age population.'" Ibid. (quoting N.J.S.A. 18A:36A-8(e)).

Despite the disparity in the enrollment, we affirmed the Commissioner's decision, finding that:

> The Charter School should not be faulted for developing an attractive educational program. Assuming the school's enrollment practices remain color blind, random, and open to all students in the community, the parents of age eligible students will decide whether or not to attempt to enroll their child in the Charter School and any racial/ethnic imbalance cannot be attributed solely to the school. To close this school would undermine the Legislature's policy of "promoting comprehensive educational reform" by fostering the development of charter schools. N.J.S.A. 18A:36A-2.
>
> [Id. at 478.]

Nonetheless, this court found that the school's post-enrollment practices were "disturbing and difficult to dismiss on this record." Id. at 480. "While the Charter School's enrollment practices might not be the sole cause of existing racial/ethnic imbalance, the manner of operation of the school after its color-blind lottery, warrants closer scrutiny to determine whether some of the school's practices may be worsening the existing racial/ethnic imbalance in the district schools." Ibid. Thus, we remanded the matter to the Commissioner to determine

39

"whether remedial action is warranted."  Ibid.

Here, and unlike in Red Bank, there are no allegations that Hatikvah's practices, after the enrollment of students by an impartial lottery, exacerbated the racial, ethnic, or economically disadvantaged population balance in its district of residence.  Instead, appellants simply claimed, in the most general of terms, that Hatikvah was more segregated than the districts—a bald claim insufficient to warrant further review on an application to amend.

It is also undisputed that the Commissioner considered the segregative effect of the charter school in approving the school in 2010, N.J.A.C. 6A:11-2.1(j), in renewing Hatikvah's application in 2013 and 2018, N.J.A.C. 6A:11-2.3(b)(8), and on an annual basis, N.J.A.C. 6A:11-2.2(c).  There is no indication in this record that there was any challenge based on the segregative effect either before this application to amend, or after (during the second renewal).  See Hatikvah, No. A-5977-09; Highland Park I, No. A-3890-14.  Nor is there any indication in this record that the Commissioner found a segregative effect during the annual review.  N.J.A.C. 6A:11-2.2(c).

Accordingly, we are satisfied that the Commissioner's decision approving the expansion was not arbitrary, capricious, or unreasonable because appellants did not provide sufficient evidence of a segregative effect to warrant either  more

40

detailed scrutiny or the denial of the application. Therefore, we reject appellants' contention on this point.

V.

In Point III, appellants argue that the Commissioner's decision approving Hatikvah's application to amend its charter was arbitrary, capricious, and unreasonable because she failed to consider "significant deficiencies" in Hatikvah's application, namely, the financial burden of the expansion on the sending districts and the lack of demand for the increased enrollment. Again, we disagree.

Before the Commissioner, appellants raised only general objections in opposition to Hatikvah's application to amend its charter, calling for a moratorium on new charter seats in Middlesex and Somerset Counties because of the alleged financial impact on the sending districts. Appellants did not submit any specific financial data to support those assertions.

East Brunswick, the district of residence, alleged, more specifically, that the "financial impact" of Hatikvah's "expansion combined with ongoing costs to support the Charter School would increase to 107% of the amount of the State's imposed budget cap" and estimated that the cost to East Brunswick Public Schools in 2016-2017 was an additional $114,833 to $293,457, or "over $1

41

million per year over the next five years."  East Brunswick also alleged that in order "to meet the required financial support of the Charter School," it had, in 2011, cut educational opportunities for its public school students.  Specifically, it:  eliminated the World Language program for 2000 public school students (which it partially restored by the 2016-2017 school year); eliminated the Summer Academy serving over 2000 students with remedial needs; and reduced its elementary teaching staff thereby raising class size.

The Commissioner relied on the Department's comprehensive review of the "fiscal impact on sending districts" in approving the amendment.

The Education Clause of the New Jersey Constitution imposes an obligation on the State Legislature to "provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years."  N.J. Const. art. 8, § 4, ¶ 1.  Funding for charter schools is provided by "the school district of residence," which is required to pay directly to the charter school 90% of its program budget per pupil for each of its resident students enrolled in the school.  N.J.S.A. 18A:36A-12(b).  Case law requires that

> if the local school district "demonstrates with some
> specificity that the constitutional requirements of a
> thorough and efficient education would be jeopardized
> by [the district's] loss" of the funds to be allocated to a

42

charter school, "the Commissioner is obligated to evaluate carefully the impact that loss of funds would have on the ability of the district of residence to deliver a thorough and efficient education."

[Quest Acad., 216 N.J. at 377-78 (quoting Englewood, 164 N.J. at 334-35).]

The district must, however, "be able to support its assertions." Englewood, 164 N.J. at 336. The Commissioner does not have "the burden of canvassing the financial condition of the district of residence in order to determine its ability to adjust to the per-pupil loss upon approval of the charter school based on unsubstantiated, generalized protests." Ibid. "[T]he Commissioner is entitled to rely on the district of residence to come forward with a preliminary showing that the requirements of a thorough and efficient education cannot be met." Id. at 334. The Court held that "[t]he legislative will to allow charter schools and to advance their goals suggests our approach which favors the charter school unless reliable information is put forward to demonstrate that a constitutional violation may occur." Id. at 336.

For example, in Red Bank, 367 N.J. Super. at 467, the Board argued that the Commissioner erred in granting the renewal without adequately considering the detrimental impact on its ability to provide a thorough and efficient education. Id. at 482. It claimed that the expansion would cause reduction in

43

the District's budget of $720,000, requiring the elimination of four teaching positions resulting in bigger classes, the elimination of courtesy busing, and the reduction of hall monitors, instructional assistants, and cafeteria monitors. Ibid.

On appeal, we affirmed the Commissioner's decision, finding that "[t]he paucity of specificity in the Board's charges is fatal." Id. at 483. Notably, the Board had failed to reference the regulations adopted to measure a thorough and efficient education. Ibid. (citing N.J.A.C. 6:8-1.1 to 4.2 (subsequently repealed, now N.J.A.C. 6A:8-1.1 to 5.3)). Further, a reduction in force would "be expected given that there will be fewer students to educate by the Board after they move to the expanded charter school." Ibid. Moreover, while "courtesy busing" might be important for Red Bank, it was not mandated or necessary for a thorough and efficient education. Ibid. Nor did the Board demonstrate how the elimination of monitors and other assistants would impair its thorough and efficient education efforts. Ibid.

Similarly, here, appellants presented only unsubstantiated generalized protests against the entire charter school scheme and thus did not make a preliminary showing on which the Commissioner could rely. Englewood, 164 N.J. at 334.

Further, East Brunswick's allegations of financial impact were less

specific than in <u>Red Bank</u>, and it failed to demonstrate that the requirements of a thorough and efficient education could not be met as a result of the expansion. As was the case in <u>Red Bank</u>, East Brunswick did not refer to the regulations establishing standards for the provision of a thorough and efficient education. N.J.A.C. 6A:8-1.1 to -5.3. Although the "New Jersey Student Learning Standards" (NJSLS) include a world language requirement, N.J.A.C. 6A:8-1.3, it is not clear from East Brunswick's submission why the program was eliminated in 2011, and more significantly, how it was partially reinstated after the approval of Hatikvah's expansion in 2014.

Moreover, East Brunswick did not account for the fact that although it has to pay the charter school 90% of certain student funding categories, it retains 10%—an amount designed to respond to concerns about the loss of funding to the District. <u>Englewood</u>, 164 N.J. at 333; N.J.S.A. 18:36A-12(b). Nor does it account for the fact that the CSPA funding formula, as amended by the School Funding Reform Act of 2008 (SFRA), N.J.S.A. 18A:7F-43 to -63, was specifically designed to fund students at the constitutionally required level. <u>Abbott v. Burke (Abbott XX)</u>, 199 N.J. 140, 147 (2009). Therefore, appellants' claim on this point lacks merit.

Appellants also argue that the Commissioner failed to consider the lack of

demand for the increased enrollment, as allegedly demonstrated by the fact that only 48% of Hatikvah's students reside in East Brunswick. This contention must also be rejected.

Preference for enrollment in a charter school is given to students who reside in the district where the charter school is located. N.J.S.A. 18A:36A-8(a). A charter school may, however, enroll non-resident students, if available space permits. N.J.S.A. 18A:36A-8(d). As in this case, a charter school may apply to the Commissioner for an amendment to its charter to expand its enrollment. N.J.A.C. 6A:11-2.6(a)(1)(i). There is no statutory or regulatory provision limiting the requested amount of an expanded enrollment, or limiting the expansion to in-district students. The Commissioner evaluates whether amendments are eligible for approval under the CSPA and the implementing regulation, N.J.A.C. 6A:11-2.6(b), under which a charter school must include information showing a "[d]emonstration of need" in its initial application. N.J.A.C. 6A:11-2.1(b)(2)(vi).

Here, Hatikvah demonstrated that need. As of June 2016, there were 149 students, from both East Brunswick and non-resident districts, on the waiting list for kindergarten through second grade. Additionally, for the 2016-2017 school year, twenty-four of the available fifty kindergarten seats went to siblings

of students thereby, according to Hatikvah, "greatly limiting access to the school for new families." Thus, the record fully supported the Commissioner's decision approving an increase in enrollment from fifty to seventy-five students in kindergarten and first grade and, therefore, we discern no basis for disturbing it.

VI.

Appellants argue in Point IV that there is no statutory authority under the CSPA to obligate them to fund their students' attendance at Hatikvah and, therefore, the Commissioner's decision was arbitrary, capricious, or unreasonable because it violated express or implied legislative policies. They contend, as other appellants do in two of the companion cases, Piscataway, and North Brunswick, that N.J.S.A. 18A:36A-12(b) explicitly limits financial responsibility for students' attendance at charter schools to the "school district of residence," which they interpret to mean the district where the charter school is located, or at most, the contiguous districts identified in the school's approved "region of residence." Thus, appellants argue that since the Commissioner's approval of the expansion was based on the presumed ongoing flow of revenue from appellants, non-resident school districts, it was inherently arbitrary and should be vacated. For the reasons that follow, however, we conclude that the Commissioner's interpretation of the funding provisions was entirely consistent

47

with the Act and the policies expressed by the Legislature.

In their resolutions calling for a moratorium on all new charter school seats in Middlesex and Somerset Counties, appellants only generally claimed that the Department had interpreted the CSPA "to require all public school districts statewide to pay charter schools for students enrolled in those schools regardless as to whether the charter serves the district's community as part of the charter's approved district or region of residence."

The scope of judicial review of a final decision of the Commissioner is limited. Quest Acad., 216 N.J. at 385. Although the Appellate Division is not bound by an agency's determination on a question of law, Hargrove v. Sleepy's, LLC, 220 N.J. 289, 301 (2015), "[c]ourts afford an agency 'great deference' in reviewing its 'interpretation of statutes within its scope of authority and its adoption of rules implementing' the laws for which it is responsible." N.J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 549 (2012) (quoting N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 385 (2008)).

"[T]he goal of statutory interpretation is to ascertain and effectuate the Legislature's intent." Cashin v. Bello, 223 N.J. 328, 335 (2015). "[T]he best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J.

477, 492 (2005). "Accordingly, '[t]he starting point of all statutory interpretation must be the language used in the enactment.'" Spade v. Select Comfort Corp., 232 N.J. 504, 515 (2018) (quoting N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 178 (2014)).

Courts "construe the words of a statute 'in context with related provisions so as to give sense to the legislation as a whole.'" Spade, 232 N.J. at 515 (quoting N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst, 229 N.J. 541, 570 (2017)). If the plain language leads to a clear and unambiguous result, then the court's "interpretative process is over." Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386 (2016). Courts "turn to extrinsic tools to discern legislative intent . . . only when the statute is ambiguous, the plain language leads to a result inconsistent with any legitimate public policy objective, or it is at odds with a general statutory scheme." Shelton v. Restaurant.com, Inc., 214 N.J. 419, 429 (2013).

At issue here, N.J.S.A. 18A:36A-12(b) provides that:

> The school district of residence shall pay directly to the charter school for each student enrolled in the charter school who resides in the district an amount equal to 90% of the sum of the budget year equalization aid per pupil, the prebudget year general fund tax levy per pupil inflated by the CPI rate most recent to the calculation, and the employer payroll tax per pupil that is transferred to the school district pursuant to

subsection d. of section 1 of P.L.2018, c.68. In addition, the <u>school district of residence</u> shall pay directly to the charter school the security categorical aid attributable to the student and a percentage of the district's special education categorical aid equal to the percentage of the district's special education students enrolled in the charter school and, if applicable, 100% of preschool education aid. <u>The district of residence shall also pay directly to the charter school any federal funds attributable to the student</u>.

[(Emphasis added).]

The term "school district of residence" is not defined in the CSPA or the implementing regulations. The term "district of residence" is defined in the regulations as "the school district in which a charter school facility is physically located; if a charter school is approved with a region of residence comprised of contiguous school districts, that region is the charter school's district of residence." N.J.A.C. 6A:11-1.2; N.J.A.C. 6A:23A-15.1.[8] A school district does not, however, reside in a district; instead, it is located in a district. Moreover, the district of residence where the charter school is located does not receive

---

[8] A "region of residence" is defined as the "contiguous school districts in which a charter school operates and is the charter school's district of residence." N.J.A.C. 6A:11-1.2. See Greater Brunswick Charter Sch., 332 N.J. Super. at 424 ("[R]egulations allowing regional charter schools are a legitimate means of effectuating the Act's purpose of encouraging the establishment of charter schools."). A non-resident school district is defined as "a school district outside the district of residence of the charter school." N.J.A.C. 6A:11-1.2.

equalization aid, security categorical aid, or federal funds "attributable" to a charter student who is not a resident of that district. See N.J.S.A. 18A:7F-43 to -63 (SFRA). Thus, it would make no sense to interpret "school district of residence" to mean the "district of residence." N.J.S.A. 18A:36A-12(b).

In fact, the State Board of Education promulgated N.J.A.C. 6A:23A-15.2 and -15.3, which as discussed in more detail in our decision today in Piscataway, require both a "district of residence" and a "non-resident district" to fund its students' attendance at a charter school. However, appellants argue that under N.J.A.C. 6A:23A-15.2 and -15.3, a "non-resident district" should be interpreted to mean only those "non-resident districts" that are within a charter school's region of residence, because those districts would be entitled to the same opportunity for input as the district where the charter school is located. N.J.A.C. 6A:11-2.1; N.J.A.C. 6A:11.2.6(a)(2). They contend that the Department's interpretation of N.J.S.A. 18A:36A-12(b) to require all non-resident districts to fund their students' attendance at charter schools is inconsistent with the Act, because non-resident districts located outside the approved region of residence are not entitled to receive notice or input as to the approval or amendment process.

Significantly, after the parties filed briefs in this case, we rejected this

identical argument in <u>Highland Park I</u>.[9]  In that case, Highland Park (one of the appellants in this case), appealed from the Commissioner's March 19, 2015 final decision approving Hatikvah's second application to amend its charter to expand its grades.  <u>Highland Park I</u>, (slip op. at 2).

In <u>Highland Park I</u>, this court initially noted that Highland Park had not raised this issue in March 2014 when Hatikvah sought to renew its charter, or in November 2014 when Hatikvah sought to expand its enrollment.  <u>Id.</u> at 14. Highland Park had never challenged the regulations requiring resident and non-resident school districts to fund their students' attendance at a charter school, and had "paid tuition for its students to attend the school for at least six years." <u>Id.</u> at 15.  Nonetheless, because it involved "an issue of law," the court decided to exercise its discretion and address the argument even though it was raised for the first time on appeal.  <u>Ibid.</u>

Turning to the merits, the court found that the plain language of N.J.S.A. 18A:36A-12(b) "expressly provides that the 'school district of residence' must pay the charter school for 'each student' enrolled in the school." <u>Id.</u> at 16.  Thus,

---

[9]  Although the case is unpublished, it involved most of the same parties and the identical issue raised here, and thus even if not binding under the doctrine of collateral estoppel, the legal analysis is persuasive and properly constitutes secondary authority in connection with the present appeals.  <u>R.</u> 1:36-3.

the court held that "as used in N.J.S.A. 18A:36A-12(b), the term 'school district of residence' refers to the district where the student resides, not the district where the charter school is located." Ibid. The court further found that the CSPA

> expressly envisions that students may enroll in a charter school, even though they reside in a district other than the district where the charter school is located. See N.J.S.A. 18A:36A-8(a) (requiring charter schools to give preference for enrollment to students who reside "in the school district in which the charter school is located"). There is nothing in the Act that would allow these students to attend a charter school without a financial contribution from the school districts in which they reside. Thus, under N.J.S.A. 18A:36A-12(b), obligation of a school district to attend a charter school is not limited to the charter school's "district of residence."
>
> [Id. at 16-17.]

Further, we found that the regulations adopted pursuant to the CSPA were "consistent with this interpretation of N.J.S.A. 18A:36A-12(b). Indeed, the regulations expressly provide that both a charter school's 'district of residence' and the 'non-resident school districts' must pay for their students to attend a charter school. N.J.A.C. 6A:23A-15.3(g)(2), (3)." Id. at 17. See also N.J.A.C. 6A:23A-15.2 (resident and non-resident school districts shall use projected charter school aid).

The court in Highland Park I also found support for this interpretation in

the legislative history, explaining that in its fiscal estimate for S. 1796 (1995),

which, combined with A. 592 (1995), became the CSPA, the Office of

Legislative Services (OLS), included the following statement:

> In regard to the funding of charter schools, the bill provides that the school district of residence would pay directly to the charter school for each student enrolled who resides in the district an amount equal to the local levy budget per pupil in the district for the specific grade level. . . . The cost for out of district pupils would be paid by the district of residence of the pupil. . . .
>
> [Id. at 17-18 (quoting Legislative Fiscal Estimate to S. 1796 1 (Sept. 14, 1995) (emphasis added)).]

That statement "makes clear that all school districts of residence must pay for

students to attend a charter school, and the financial obligation is not limited to

the charter school's 'district of residence.'" Id. at 18.

In so ruling, we found unpersuasive Highland Park's citation to other

provisions of the Charter School Act that pertain to a charter school's "district

of residence." Id. at 18. For example, the court found that

> Highland Park cites N.J.S.A. 18A:36A-4(c), which requires a proposed charter school to provide a copy of its application to the "local board of education." However, the statute does not support Highland Park's argument. N.J.S.A. 18A:36A-4(c) also requires the Commissioner to provide notice to "members of the State Legislature, school superintendents, and mayors and governing bodies of all legislative districts, school districts, or municipalities in which there are students

who will be eligible for enrollment in the charter school."

Highland Park also cites N.J.S.A. 18A:36A-14(b), a statute that limits a charter school's salaries to the salaries of the highest step in the district where the school is located; and N.J.S.A. 18A:36A-16(b), which requires a charter school to serve a copy of its annual report on the local board of education in the district where the school is located. However, these statutes have no direct bearing on whether a student's "school district of residence" must pay for students from that district to attend at a charter school.

[Id. at 18-19.]

Thus, we concluded that

under N.J.S.A. 18A:36A-12(b), the term "school district of residence" means the school district where the student resides, and each "school district of residence" must pay the charter school for its student to attend the school, in the amounts required by the Act and the regulations. We therefore reject Highland Park's contention that only the charter school's "district of residence" is obligated to pay for its students to attend the school.

[Id. at 19.]

Similarly, as addressed in Piscataway, the Commissioner issued a final decision in which she interpreted the CSPA and the regulatory provisions, N.J.A.C. 6A:23A-15.1 to -15.4, to require school districts to "provide funding for its students enrolled in charter schools located in other school districts." Bd.

of Educ. of Twp. of Piscataway v. NJ Dep't of Educ., EDU 10995-16, final decision, (July 27, 2017) (the Piscataway Board of Education was obligated to pay for its resident students to attend a number of out-of-district charter schools, including Hatikvah).

Appellants argue that under that interpretation, non-resident school districts will be deprived of due process because non-resident districts are not entitled to receive formal notice of a charter school's application to amend its charter, or input into the amendment process. See N.J.A.C. 6A:11-2.6(a)(b). They argue that "the net effect of these regulations as applied by the Department is to render every New Jersey district the 'district of residence' of every charter school in the state."

However, because preference for enrollment in a charter school is given to students who reside in the school district in which the charter school is located, N.J.S.A. 18A:36A-8(a), it is likely that the majority of students will reside in that district, and thus it makes sense that the district of residence should receive formal notice and an opportunity for input. Moreover, it was undisputed that appellants in this case, and in the back-to-back companion appeals, were aware of the amendment and had an opportunity to submit comments on the amendment requests involved in these cases. In fact, the Commissioner

received, and considered, comments from several school districts, individuals, an educational service commission, and even several legislators. Thus, the notice provisions simply do not relieve non-resident districts from bearing financial responsibility for their students' attendance at charter schools.

We are persuaded by the reasoning expressed in Highland Park I, and by the Commissioner in her final decision in Piscataway. The plain language of the statute requires each student's district of residence to pay for the student to attend a charter school. N.J.S.A. 18A:36A-12(b). That interpretation is entirely consistent with the Act and the policy expressed by the Legislature. Charter schools are open to all students, both resident and non-resident students, and there is no indication in the Act that the Legislature intended to exclude non-resident districts from funding their students' attendance at a charter school. It is also consistent with the legislative history and the implementing regulations, which require a non-resident district to fund its students' attendance at a charter school. N.J.A.C. 6A:23A-15.2 and -15.3. Thus, appellants are obligated to provide funding for their students enrolled in Hatikvah.

## VII.

In sum, we affirm the Commissioner's decision approving Hatikvah's application to amend its charter, and compelling appellants to fund their

57

students' attendance at that school. The decision was not arbitrary, capricious, or unreasonable, promoted the legislative policy of the CSPA, and was fully supported by the record.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3455-16T1